The first argued case this morning is number 09-1564, SPECTRALYTICS v. CORDIS CORP. Mr. Vandenberg. Thank you, Your Honor. May it please the Court. This is the case involving equipment for cutting stents by laser cutting. And after a two and a half week jury trial, the jury found that the defendants had infringed SPECTRALYTICS v. 277 patent. They found that the defendants had failed to prove the invalidity of the patent. They found the infringement to be willful, and they awarded damages of approximately $22 million. Now, for SPECTRALYTICS' appeal, I'd like to focus this morning on the district court's legal error when it effectively discounted and disregarded the jury's willful infringement finding in connection with its analysis of enhanced damages under Section 284. Why is that a legal error when we have so many cases that say it's discretionary? Well, it is also well established in the law that one way to abuse one's discretion is to misapply the law. And that's what the judge did. He had a misunderstanding about how the law applies to the enhanced damages analysis. And here's what happened. SPECTRALYTICS' willfulness case was based on evidence showing that the defendants, and specifically the defendant Cordes, knew about SPECTRALYTICS patents for years before suit was filed. And they knew about the risk associated with that patent. But they took no steps to investigate that risk and no steps to mitigate that risk until well after being sued. Now, the district court didn't quarrel with that. In fact, the district court, in its enhancement decision, made his own express finding that the defendants did not carefully investigate the patent until well after they were sued. But here's where the legal error occurred. He expressly discounted that fact because he believed that after this court's Seagate decision, such failure to investigate a known risk was no longer relevant to willfulness and therefore was no longer relevant to the enhancement decision. Now, that's legal error for two reasons. One is subsequent to the district court's ruling, this court made clear that the change in law in the Seagate case did not change the factors that are considered an enhancement. They did not modify the so-called read factors. So there's the first legal error. Precisely the same rationale that was used by the district court here was advanced by Microsoft in its briefs to this court and was rejected in the opinion. And so we have that issue. And then in addition to that, of course, the predicate to the judge's analysis was his belief that that willfulness difference. I'm sorry? Let's assume for purposes of argument that the district court judge had discounted factor two in the light of Seagate made an error, legal error. You're not supposed to do that, at least that's what I4RI tells us. Is it harmless error? It's not. What about the balancing of the other factors? Well, without necessarily deciding which are more important and some are just positive or not, if there is one issue that is most important, it's that investigation when you find out about the patent. Again, because keep in mind that willful infringement is a predicate to enhanced damages. So there's a recognition already that that's an important issue. What were the other read factors here that are in your favor? Well, certainly the case wasn't close, right? Well, certainly our position is that the case was not close. Now, the judge found otherwise on that. But that's a factor that we do think should favor us here. The relative size of the parties should definitely come into play here. We've got a very large defendant and a very small plaintiff here. At the end of the day, we're not quarreling with the fact that the judge gets to exercise his discretion. But in view of the fundamental importance of the one factor he discounted, which is really the heart of the willful infringement finding itself, to go in and say, I'm going to decide whether to enhance damages based on willful infringement. But I'm going to discount the willful infringement. What I'm trying to get at is whether there's any factor here that would weigh in your favor other than factor two. Your Honor, let me. Which is factor two? Factor two is whether, this is the point, whether the infringer knew about the patent. And if so, whether he took steps to investigate whether he had a reasonable basis to believe he was an infringer. And this is the factor that Microsoft wanted to take out of play in an I-4-R. I am just told you can't take it out of play. So what I'm trying to get at is it doesn't make any sense for us to remand the case to a district court if the remand is going to be futile. I mean, there are a lot of resources used up in that process. You would appreciate that. Yeah, but I guess what I would say is I don't think any of the other factors so strongly goes against us that you could say, well, we could affirm on this basis alone. For example, on- He worked through the fact. He said most of the factors way against are neutral. Well, I think what he, but I think in effect- So let's assume we agreed with the judge it was a closed case. I still- I realize you don't want to have that position. Right, right. No, I understand. What I'm trying to get at is how do you run down the figures of deliberate copying? Well, the judge said there was evidence of deliberate copying. He wasn't willing to find it himself. But he, I think, effectively viewed that as a neutral factor because there wasn't strong evidence one way or the other. He did recognize there was evidence of copying, though. And the behavior of litigation, he didn't find that there was- He actually made a finding on two. He said that it didn't carefully investigate until trial. Right, that's kind of the heart of our argument is that there was a specific finding on factor two, but then it was discounted. That Cordes wasn't motivated to harm your client. Cordes didn't attempt to conceal. Duration wasn't excessive. In that regard, Your Honor, of course, recall that there was 10 years of infringement. Isn't it bottom line here, the fact that Cordes is rich and then may have flunked factor two? Well, we certainly have the size of the parties. The other ones, I think if you look at them on balance, it's more fair to say that the judge viewed them as most neutral. But then, again, we have the discounting of effectively the willful infringement finding itself. And I guess what our position is, is that this is such a strong, important issue that we do need a remand, not to order the judge to find enhanced damages, but simply so that he can properly exercise his discretion. My supposed argument would be that if the error was clear, even though one might harbor some question about whether or not it was harmless, it's out there and it's in the law. And unless we correct it, other district court judges are likely to make the same mistake. Well, certainly it should be corrected in law. It's a process case. That is certainly true, Your Honor. Your Honor, I hope you'll reserve quite a bit of time. And I appreciate that because of the nature of the cross appeal. So I think this is time now. Let's hear from the other side. Thank you, Your Honor. We'll save the time you reserve. Thank you. Mr. Diskind. Thank you. May it please the court. Unless there are questions about the Spectralytics Appeal, I'm gonna focus on our appeal. Do you wanna concede error on that? No, I won't concede error on that. What do you do with I-4-I? I think in light of I-4-I, the judge probably should consider the factor, but I think it's overwhelmingly harmless. It's overwhelmingly harmless because the driving consideration, which I think permeates the judge's analysis. Do you admit the error? Yes or no? It sounds like the right answer would be to say yes. Okay. I'll tell. Go ahead and say it. If that's the right answer, you ought to say it. I'll take that. But you're saying it's a harmless error and therefore there should be no remand. It's plainly harmless error. The judge's driving factor in his analysis was the closeness of the case, his personal view that if he were the decision maker, it would be obvious. And plainly based upon that, the district court thought it was entirely fair game for a courtist to litigate the case. And that was the judicial system is served by parties litigating close cases and there's no point in penalizing. And so I frankly think that if there were a reversal for consideration, he would take a look actually at A2102, which is a letter from Mr. Coletti to the other side explaining Johnson & Johnson's views on this case prior to litigation, which Mr. Coletti plainly says, there's knowledge that you don't know about about how stints are being made that you haven't considered. We'd be happy to discuss it with you. There's part that wasn't before the patent office. There's a very substantial record actually that J&J seriously looked at these matters before litigation. And I think that the judge would wind up in exactly the same spot. Would you comment on the point which we didn't reach this morning, but which is in the brief that there is, it was an element of reckless disregard of whatever adversely held patents there might be in proceeding without investigation. I think there was no reckless disregard because I think when you look at the facts, you look at the letter I just described to you, you'll see that in fact there was, and we didn't waive privilege. So the record is constrained, but the letter at A2102, which is J&J's response upon being given notice, plainly sets forth how J&J investigated and proceeded. And J&J plainly identified not prior art, but real world devices they was aware of, such as the LPL machine, which was proved to be prior art at trial. It plainly identified that there was significant art not presented to the patent office, which was the Swiss art, which we proved at trial. And I think there just isn't going to be a basis in fact for anyone concluding that J&J proceeded to recklessly on these facts. Well, we have the jury verdict that heard all of this, that nonetheless found no place. Yeah, I think the jury verdict, this is something of a sideshow, but I respectfully think the jury verdict on willfulness should have been set aside. The district judge concluded wrongly in our view that we had waived JMO on that by not in hoc verba stating that the willfulness verdict should be set aside. Instead, we argued- You say the judge was wrong in saying that you'd waived it? It wasn't raised? Yes, we didn't raise it as an appeal. To me, it's a side issue, but I'm responding to your honor's question. Well, it's really not a side issue. It's a major issue, but you didn't appeal that issue. We did not appeal that issue. We accepted it for purposes of this appeal. So we'll accept for purposes of the appeal that we acted with willfulness. The district judge, nonetheless, saw the record, knew the facts, gave careful consideration to weighing them under the Reed factors, and I think he would reach exactly the same conclusion if factor two were thrown back into the mix. All right, let's turn to your appeal. Okay, thank you, Your Honor. The basic invention is one that never should have been issued by the Patent Office. This is a very simple device for arranging mechanical parts in a device that cuts stents. The Patent Office issued the patent not being aware of the Swiss prior art in which cantilever design had been used for well over a century. This was touted in the patent as the great advantage of the invention. The PTO issued the patent not being aware of the LPL stent cutting machine, which had already taken the ideas of Swiss art and moved them into laser cutting, and the PTO issued the patent without being aware that Gary Oberg, Spectralytics president, actually had a patent on a fixture that was carried on a laser. Instead, the Patent Office, ignorant of these facts, issued the patent. The invention is utterly simple-minded. We are talking about... Well, the reference wasn't from the Patent Office, and neither was the testimony that was given to the jury on the teaching away issue. Yeah, yeah. The teaching away issue... But, I mean, the point is that there was testimony given by Lawrence Gill on the art that said that in his version, in his view, the Swiss art taught away from a movement of the... Yeah. Of the Patent Office. That's... Oh, sorry. Well, teaching away is a question of fact. It's in front of the jury. It's unrebutted evidence. It's substantial evidence, right? Well, no, and I'll tell you why. The teaching away evidence goes hand-in-hand with Spectralytics' entire defense to this case, which is to defend a patent it doesn't have, which is to say this. The patent it obtained is a patent on having a workpiece fixture in a fixed spatial relationship with a laser. Now, that patent is obvious. Having two pieces in a fixed spatial relationship so that you can cut good parts is just a truism. This is no more complicated than if you wanted to cut a piece of wood with a saw, you would take a C-clamp and attach the piece of wood somewhere solid so you would get a good cut. If you want me to take a pair of scissors and just cut that testimony out of the transcript, and just slice it up and reach over and put it in a box and say, jury never heard of that. No, no, no, that's not what I'm, let me get to my point. My point is that that's what the patent is about. That's a legal question. This panel can look at the patent and understand that the objective reach of the patent, which is KSR's words, the objective reach of the patent is a device that has two pieces in a fixed spatial relationship with each other. The patent does not require minimizing vibrations. The patent does not require delicate cuts. The patent does not require even cutting stents. Now, to prove their infringement case against us, they did not have to prove that our machine minimized vibrations, and they didn't have to prove it made delicate cuts, and they didn't have to prove that it could cut stents. It did, but. So here we have. I'm sorry. Well, let me see if I understand your argument about the fixed spatial arrangement. The patent refers to a workpiece fixture rigidly carried on the cutting tool in a fixed spatial arrangement. Yes. Right. So it's more than simply saying some fixed spatial arrangement. It's a particular fixed spatial arrangement. So I thought you were arguing that however you achieve a fixed spatial arrangement, that's sufficient, but that wouldn't be so, right? Oh, no, I completely agree with you. What I'm starting with is that the patent claims a way to achieve a fixed spatial relationship. The way is carrying it on the laser, and what is obvious is that there are many ways to achieve that fixed spatial relationship. Well, that may be so, but if no one had thought of this way, and it wasn't obvious to one of skill in the art that this way would work, the fact that there were other ways to achieve the same objective wouldn't make the patent invalid, right? Sure, I agree. However, the undisputed proof, I want to separate the undisputed proof from the lots of side issues that were out there. The undisputed proof is that you need to fix it to something to make a good cut, and that every single person in the art who testified considered the laser an appropriate thing to fix a fixture to. Now, let me just review that very quickly because this is the key to our case. The key to our case is that, and this has nothing to do with vibrations or teaching away, so I'll come back to that in a moment if I may, but I just want to make this very important point. Every single witness, there were 10 witnesses who testified, every one of them agreed that the laser could support a workpiece fixture. It was known to those of skill in the art that that was true. Jeff Miller from Norman Noble at A1000 talks about putting C-clamps and magnets to attach fixtures to the lasers. Bill Dobbins at A1092, who designed the modified Comtel machine, also talks about using rubber tape, rubber bands, magnets, to attach fixtures to lasers. Fritz Muller of Lausade, the laser manufacturer who tried to interest companies in using lasers to make cutting tools, testified at A1062 that he experimented very quickly with attaching fixtures to lasers, and at A1063 disclosed that to his customers. Richard Press of LPL, who made the Comtel machine at A1108, testified that he made such a design in 94 or 95. John Dunbar of RMS, who designed the LPL machine, testified at A1012, the laser cutting tool was strong enough to support the bushing. George Macaronis, a J&J engineer, after looking at a design with a workpiece on the laser, said, as long as the connection is rigid, it doesn't matter where you make it, it's a matter of convenience at A946. The inventor, Gary Gustafson, the laser was plenty strong enough to support a fixture at A697. Gary Goberg, his boss. Well, of course, some of those are just to say that it works, that it's plenty strong enough. Well, that's the only question. From our view, here's what the question is. The question is... I don't think there's any doubt here that this improvement, if it is an improvement, works. No, no, these are prior to the invention. This is just looking at the invention. Well, I understand, but those are people who are saying this kind of structure, as I understand the testimony, this kind of structure would work. Yeah. And that's different from saying  or we considered it, or it's been clear to us. The question in Graham, the question in Martin, the question in KSR is, in an area in which people don't write scholarly articles, I mean, this is artisans working in workshops, what is within the knowledge of those of skill in the art? What's in the knowledge of those of skill in the art is, you need a stable place to attach the workpiece that's gonna be close to the laser. You've gotta find a place. You have a motivation to find a place and any sturdy enough place is good enough. You have a limited number of routine choices. You can attach it to the table here. You can attach it to the frame there. You can attach it to the laser there. That's our universe. We have a universe of three choices that are predictable all. I can go back to the jury trial. Yeah. They obviously tried charges given to the jury. No, but here's the problem. The three points you're making now, you know, a limited number of predictable solutions under that precise charge was given to the jury and the jury, and they were told, if you find what you just said, then the invention may be obvious. Right. Now they found the invention not obvious. That's true. So they rejected your argument. But they rejected it, and this is the key to it. The district court upheld it based upon requirements that are not in the patent. These ideas about minimizing vibrations, their expert conceded that it was obvious, except for the inventor's goal of minimizing vibrations. Well, I tell you that the patent doesn't require that you minimize vibrations. KSR says unequivocally. How do you explain the jury verdict in the light of the obvious to try and charge? I think they were wrong. I think that's why we need to correct the jury verdict. I think the minimizing vibration, the district judge seemed to think it was permissible to talk about minimizing vibrations in connection with this patent. It isn't. KSR says that the inventor's purpose is irrelevant. What matters is the objective reach of the claim. The objective reach of this claim does not include minimizing vibrations. You can make embodiments of this patent that don't. It was a problem in the prior art. I'm sorry? It was a problem in the prior art. It was not a problem in the prior art. It was a problem in the Swiss art if you sought to minimize vibrations. The Swiss art, respectfully, was wildly unrelated to the problem that we're dealing with today. The Swiss art was like looking at horse and buggies and trying to learn something about making gasoline engines after the gasoline engine had been invented. We had already moved beyond these giant bulky machines into the LPL laser cutting machine. There was no evidence whatsoever that the LPL machine posed any uncertainty whatsoever about using the laser. Didn't Madsen testify? I'm sorry? Didn't Madsen testify that this carried on limitation was meant to address vibrations and relative movement? He absolutely said that. He absolutely said that. What I'm saying to you, and that's why we're here as a matter of law, is that's an irrelevant consideration under this patent. This patent is not about minimizing vibrations. If you want the simplest proof of that, go look at the commercial embodiment that they made. We need to wrap up this argument. We've exhausted your rebuttal time as well. Look, if you have a moment, at A6181, which describes their commercial embodiment, which was plagued with vibrations. You can make a device under this patent that vibrates like crazy. There's nothing in the claim that precludes vibrations, and you cannot defend the validity of the patent, in our view, on the inventor's purpose not reflected in the claim of minimizing vibrations. Thank you, Judge Newman. Okay, thank you, Mr. Gerstin. Mr. Waldron-Gerstin. The defendant's argument on obviousness is fundamentally based on hindsight. They start with the claim language that claims as one of the features carrying the workpiece fixture on the laser head in a fixed spatial relationship or fixed spatial arrangement, and they then take part of that solution, the fixed spatial arrangement, and they create a problem out of it. They say, well, there's a problem. You need to figure out how to have a fixed spatial arrangement, and so let's look around and see what the options are. But at trial, there was no evidence that the art considered it to be a problem in terms of how you created a fixed spatial relationship. The evidence was that the prior art was completely satisfied with just putting the workpiece fixture down on the table. So nobody was out there looking around for a different place to put the workpiece fixture. Mr. Diskant says there are really only three choices. Do you take issue with that? Yes, we certainly take issue with that. How would you characterize those three choices? Well, there are literally thousands of choices. You can say up, down, left, right. Let's use them. Yeah, let's speak generically. I mean, you wouldn't say there are 100 different places on the cutting tool to put the fixture. Well, but for example, one of the points that Mr. Diskant tried to make on cross at trial was, well, it's down or up. And of course, in the inference being up, you should go up to the laser tool. Well, up isn't necessarily to the laser tool. Up could be to the frame. And in fact, when he says, well, Mr. Holbrook invented the idea or already had the idea of connecting to the laser, there's a turn of phrase there he's playing with, which is he's attaching it to the laser. Well, the laser is a big piece of equipment. And there's a difference between saying I'm going to attach it to the laser and saying I'm going to attach it to the laser head. So when you talk about reasonable number of options, there are a lot of different places you could go. And in fact, there was evidence at trial, for example, that one of the things that LPL and RMS tried when they decided they didn't want it down on the table, they went to what's called the z-axis, which again is part of the laser frame. So it isn't one of just a number of known options. There are a small number of known options. But again, the most fundamental point is that nobody was looking for another place to put it. There was no recognition that where they had started, there was anything wrong with that. And this then ties into, to some extent, the teaching away evidence. They're the ones bringing the Swiss prior art into this case. Undisputed evidence at trial from both experts, their expert and our expert, was that according to the Swiss prior art, you needed to deal with vibrations. And the way you dealt with vibrations is that you tried to dampen them. You tried to get rid of them. You found the heaviest thing in the room and you cranked everything down to that heavy base. And again, the undisputed evidence, even if it weren't undisputed, you'd have to give it to us because the jury ruled our way. But the undisputed evidence at trial was that Mr. Gustafson went away from that teaching. He went contrary to that teaching when he hung it off the laser head, which was not the most stable place in the room. Now, what's the difference between the patented invention and, let's say, the LPL machine? We don't dispute that the one difference between those two things is that in the LPL machine, the workpiece fixture was not carried on the laser head in a fixed spatial arrangement. It was Swiss-style, but in some sense, the LPL machine itself confirms the teaching away because what it shows is... When you say Swiss-style, it was... It was cantilevered. Everything is cantilevered. No, no, that's not true. That was... The laser cutting industry started with lathe-style cutting. Well, I don't say everything. I mean, your... For example, your commercial... Yes. ...is cantilevered. Yes. And the patent claims, as one of the elements of the invention, cantilevered-style cutting. And I think when we talk about Swiss-style cutting, that's synonymous with cantilevered-style cutting. Well, okay. There's certainly some machines that would be cantilevered that wouldn't be Swiss-style machines, right? Yes, that's true. But Swiss machines were cantilevered. Okay. What I'm trying to go is, without talking about the Swiss-style machines, as Mr. Huber, I guess, was talking about, tell me, again, what is the difference between the LPL and your invention with respect to the location of the fixture? In the LPL machine, the workpiece fixture was bolted down to the base. Yes. Okay. It was, in that regard, like the Swiss machines, but like all other machines, even the lathe-style machines in the laser cutting art, they were just plain old bolted down to the table. And so it did not have the... And in the lathe-style machines, these are the non-cantilevered... Correct. Correct. So all the prior art, also in the laser art, simply had the workpiece fixture on the table. And so we have this difference. Now, I want to talk about the vibration issue. And I have difficulty, to some extent, understanding Mr. Descant's argument that we should ignore vibration, but I'm going to try to address what I think it is. First of all, there's a legal problem and a factual problem with it. The legal problem is that teaching away, in some sense, is the flip side of motivation to combine. It's motivation to combine versus motivation to not combine, or motivation not to do something. Well, if we go back to KSR, one of the fundamental rulings, really, why the Supreme Court took the KSR case, was to say that, look, you don't look at just the reason that the inventor may have done something in terms of a motivation to combine. If there's any motivation to combine, that is enough to render an invention obvious. Well, the same is true for teaching away. If there's any reason in the art why you wouldn't combine two teachings together, that ought to render the invention non-obvious. It doesn't matter whether the inventor recognized it or not. If there was a reason why those skilled in the art weren't doing it, that's relevant evidence, relevant of non-obviousness. Now, there's also the factual response to that, which is the claim, of course... That's KSR's loss on our law on teaching away, right? Yes, yes. We have a claim to that. No, but that's certainly one of the things that they accused this court of doing, was only looking to the one reason. And they said, no, you've got to look to any reason. Well, the same is true of teaching away. You need to look at any reason there is not to do something is relevant to the issue of non-obviousness. But as a factual matter, if you read this patent, the claim limitation, but the claim isn't required to claim its function, it's a thing. And what it claims as an element of the structure is a workpiece fixture carried on the laser cutting tool in a fixed spatial arrangement. And if you go to the specification and you find where it talks about that, it identifies the specific advantage of that structure is to keep those two elements lined up and so that there's no problem if there is, for example, bumping and jarring. Now, they say, well, bumping and jarring, that's not vibrations. Well, sure it's vibrations. And, of course, there was testimony from Mr. Madsen and others that that was a reference to vibration. And as I believe you pointed out, Judge Clevenger, in view of the jury's verdict, we have to accept those fact findings as true. The jury was instructed on obvious to try. They were instructed on the Graham factors. And this is one of those cases where all of the underlying factual issues were heavily disputed at trial. So this is a case where, and I guess the last point I'll make is, if you go to pages 45 to 47 of our response brief, we laid out in bullet point form the facts that need to be accepted as true under the correct view of the evidence based on the jury's verdict. The defendants have not directly attacked that bullet point list at all. Instead, they just keep insisting on their version of the facts. I submit, Your Honor, that if you read pages 45 to 47 of our brief and take that list of facts as true, you will agree with the jury and with the district court judge that the defendants did not prove the integrity of this invention by clearing convincing evidence. Any more questions for Mr. Madsen? Any more questions? Thank you, Mr. Vandenberg. Mr. Diskin, you have three minutes. Thank you, Your Honor. Let me just hit a couple points and then sit down. First, I'd just like to direct the panel's attention to the patent itself, figure one, because I think there's been a lack of clarity about what the invention's about. Two is the laser cutting tool. Two is the entirety of this massive piece of equipment. It's not just the nozzle where they've shown the piece attached. It is the entire piece of equipment. A laser cutting tool, as illustrated generally, is two. The claim is about attaching the workpiece fixture to the laser cutting tool. You could attach it anywhere in a fixed spatial relationship. That's one of the reasons that this patent is not about minimizing vibrations, but just about getting a fixed spatial relationship. And indeed, if you look at A6181, you'll see a report about their commercial embodiment of this invention, which says, it's unstable, the tooling becomes misaligned from system vibrations and being bumped. This isn't a patent about minimizing vibrations. It's a patent about getting a fixed, stable relationship between parts. Now, what did the prior art teach? What did those of skill in the art know? I direct your attention to A5394, which is a design drawing from 1994, two years before the priority date. And this design drawing unequivocally demonstrates the bushing rigidly connected, or the workpiece fixture rigidly connected to the laser. This is part of the work of LPL and RMS in developing a design. This design was created, there's no doubt about that. There was a lot of dispute at trial about whether it was manufactured or not, but the drawing is in evidence, and clearly was a drawing. When you talk about motivation, we've heard a lot about what people thinking about Swiss heavy cutting machines would or wouldn't do. Here's real motivation in the laser cutting tool. Look in the record at Mr. Dunbar's testimony at A1007 and A1008, transcript pages 19 and 20.